Filed 1/19/23  Schuchmacher v. Rockpointe Homeowners Assn. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ORLY SCHUCHMACHER, as Executor, etc., | B299589 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. PC056764) |
| v. | |
| ROCKPOINTE HOMEOWNERS ASSOCIATION et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge.  Reversed with directions.

Law Offices of Roger L. Stanard and Roger L. Stanard, for Plaintiff and Appellant.

Gordon & Rees Scully Mansukhani, Craig J. Mariam and Alison M. Pringle, for Defendants and Appellants.

———————————

This litigation arose from a fire in April 2011 that caused damage to Gershon Schuchmacher's condominium unit in the Rockpointe condominium development. Schuchmacher,[1] along with his tenant, Kathleen Latham, and a contractor, Michael Ruffino, sued, among others, the Rockpointe Homeowners Association, Inc. (Rockpointe or HOA), four former members of Rockpointe's Board of Directors, and the current owner of the unit, William Sturgeon, for a variety of causes of action, including breach of Rockpointe's governing documents, breach of fiduciary duty, and civil conspiracy. At trial, the court nonsuited Latham and Ruffino, and a jury (1) awarded Schuchmacher damages of $76,432 for Rockpointe's breach of its governing documents, and (2) found the former directors and Sturgeon were not liable for breach of fiduciary duty or civil conspiracy. Posttrial, the trial court denied Rockpointe's motion for judgment notwithstanding the verdict, awarded Schuchmacher prevailing party attorney fees, and denied Rockpointe's and the former directors' motions for attorney fees. Rockpointe and the former directors appealed from the judgment, the order denying the motion for judgment notwithstanding the verdict, and the attorney fees order, and Schuchmacher cross-appealed from the attorney fees order.

———————————

[1] Gershon Schuchmacher died prior to trial, and Orly Schuchmacher, the executor of his estate, was substituted as plaintiff. We will refer to both Gershon Schuchmacher and Orly Schuchmacher, in her capacity as plaintiff, as "Schuchmacher."

2

On appeal, Rockpointe contends that the damages award was not supported by substantial evidence, and Rockpointe was entitled to recover its postoffer costs, including its attorney fees, under Code of Civil Procedure section 998 because its pretrial settlement offer exceeded Schuchmacher's recovery. Separately, the former directors contend they are entitled to attorney fees pursuant to Civil Code section 5975, subdivision (c), which permits an award of attorney fees to the prevailing party in an action to enforce common interest development governing documents. In his cross-appeal, Schuchmacher contends the trial court abused its discretion by reducing his recoverable attorney fees from $913,005 to $67,000.

We conclude that substantial evidence did not support the jury's damages award, and thus we will reduce Schuchmacher's damages for breach of Rockpointe's governing documents to $1. Having done so, we will vacate the trial court's order regarding Schuchmacher's and Rockpointe's motions for attorney fees and to tax costs, and will direct the trial court on remand to reconsider the parties' requests for attorney fees and costs in light of Schuchmacher's reduced recovery. Finally, we conclude that the law of the case doctrine compels the conclusion that the former directors are not entitled to recover prevailing party attorney fees pursuant to Civil Code section 5975, subdivision (c).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The April 2011 fire in Schuchmacher's unit.

Schuchmacher bought a two-story condominium unit in the Rockpointe condominium development in Chatsworth, California (the unit) in 2003. In 2010, Schuchmacher experienced financial difficulties and fell behind on his mortgage payments and

3

homeowner's association dues.  The same year, Schuchmacher's friend, Latham, began renting the unit's master bedroom.

On April 16, 2011, a fire broke out in Latham's bedroom. The fire caused significant damage to the upstairs bedrooms and bathrooms, and the entire unit suffered water and smoke damage.  The cause of the fire was never determined.

Schuchmacher's mortgage holder, Bank of America, had initiated foreclosure proceedings on the unit prior to the fire.  As discussed more fully below, Bank of America foreclosed on the unit about six months later, in October 2011.

## II.    Rockpointe's governing documents and fire insurance policy.

Rockpointe's operations were governed by its "First Restated Declaration of Covenants, Conditions, and Restrictions" (CC&Rs).  Among other things, the CC&Rs required Rockpointe to "obtain and maintain a master or blanket policy of fire and casualty insurance, for the full insurable value (replacement cost) of all the Improvements within the Properties," defined to include "buildings, walls, decks, fences, swimming pools, landscaping, landscape structures, solar heating equipment, spas, utility lines, or any structure of any kind."  The CC&Rs also required individual unit owners to "obtain and maintain assessment loss coverage for fire, earthquake, and other casualties with a minimum limit of $25,000," and permitted individual owners to maintain "[c]overage on portions of the structure not covered by the Master Policy of the Association," "[l]oss of use coverage for living expenses," and "[p]ersonal property coverage."  The CC&Rs provided that Rockpointe's master insurance policy "shall be the primary coverage in the event of a loss covered by the Association's insurance."

The CC&Rs provided that if there were a "total or partial destruction of the Improvements in the Project, and the available proceeds of the insurance [described above] are sufficient to cover not less than 85 percent of the costs of repair and reconstruction, the improvements shall be promptly rebuilt. The Association shall solicit and obtain bids from at least two reputable contractors to repair and reconstruct the improvements in accordance with the original plans." Thereafter, "the Board or its authorized representatives shall, after obtaining bids from not less than two, but no more than four, reputable contractors, award the repair and reconstruction work to the most qualified and responsible contractor who is licensed for the work, has adequate liability insurance coverage and workers' compensation coverage."

With regard to repair costs not covered by insurance, the CC&Rs provided that "each Owner shall be obligated to contribute an equal share to the cost of reconstruction or restoration over and above the available insurance proceeds," but "[t]o the extent the Association's Master Policy pays separate interest damages, the Owner of such separate interest is responsible to pay any deductible which is attributable to such separate interest." Alternatively, if damage or destruction was caused "by the willful misconduct or negligent act or omission of" an owner or the owner's family, tenants, or guests, "the Board shall cause the same to be repaired or replaced, and all costs and expenses incurred in connection therewith shall be assessed and charged solely to and against such Owner as a Special Individual Assessment."

With regard to maintenance, the CC&Rs provided that each condominium owner was responsible for maintaining his or

her unit, but "[n]o 'improvement' . . . shall be commenced, erected, or maintained within the Property, nor shall any exterior addition, or change or alteration be made in or to any portion of the Common Area, any Unit, any Common Facility structure, or to any Exclusive Use Common Area until the plans and specifications . . . shall have been submitted to and approved in writing by the Association's Board of Directors."

As required by the CC&Rs, Rockpointe maintained a master fire and casualty insurance policy with Farmers Insurance (Farmers). The Farmers policy included coverage for, among other things, the interior walls of individual units, but not the units' contents. The policy also provided that Farmers was the primary insurer for any covered loss, and the unit owners' individual policies were secondary.

Separately, Schuchmacher maintained an individual insurance policy with State Farm Insurance (State Farm) that provided coverage for losses to his unit and personal property, loss assessments, and temporary housing for up to 12 months if his unit became uninhabitable due to a covered loss.

## III. Rockpointe makes a claim under its fire insurance policy and assesses Schuchmacher for the deductible; Schuchmacher fails to pay the assessment for the deductible and loses his unit to foreclosure in October 2011.

After the fire in Schuchmacher's unit, Rockpointe's general manager, Carol Brockhouse, initiated a claim with Farmers under Rockpointe's master fire insurance policy. In May 2011, Farmers provided Rockpointe with a detailed scope of work describing the covered repairs the unit required. Farmers estimated the replacement value of the covered losses, which

included the costs to repair all the interior walls of Schuchmacher's unit that had been damaged by fire, at $86,832. In May 2011 and April 2012, Farmers issued Rockpointe two checks totaling $76,432—the amount of the covered losses, less a $10,000 deductible and a prior payment for lead and asbestos testing. Rockpointe placed these funds in a segregated account for the benefit of the unit.

In May 2011, Rockpointe obtained estimates for the repair work from three contractors. It thereafter notified Schuchmacher that a meeting "for the purpose of discussing the circumstances involving the fire in your unit . . . and payment of the $10,000 insurance deductible" would take place on June 15, 2011.

Both Schuchmacher and Latham attended the June 15, 2011 meeting, at which Rockpointe's Board of Directors (Board) voted to approve an individual special assessment against Schuchmacher in the amount of the $10,000 insurance deductible. The Board agreed to provide Schuchmacher with a letter of responsibility that he could submit to his individual insurer, State Farm, to make a claim under his loss assessment coverage, and Schuchmacher agreed he would turn over the $10,000 deductible to the Board when he received it from State Farm. The Board also discussed that it had received bids from three separate contractors for the repair work and "the delay in signing a contract stems from receipt of payment of the $10,000 deductible."

The following day, June 16, 2011, the Board provided Schuchmacher with written notice of the $10,000 special assessment, due July 15, 2011. Brockhouse testified that it was the Board's position that it would not begin repairs until the special assessment was paid.

7

State Farm issued a check for $10,000 made out jointly to Schuchmacher and his mortgage holder, Bank of America, on August 17, 2011. Latham testified that she mailed the check to Bank of America with a request that the bank endorse the check to Rockpointe. However, according to Latham, neither she nor Schuchmacher received an endorsed check from Bank of America, and it is undisputed that the proceeds were never paid to Rockpointe.[2]

In early September 2011, Schuchmacher requested a meeting with the Board to discuss his disagreement with the $10,000 special assessment for the insurance deductible. The meeting took place on September 15, 2011, at which time Latham showed the Board a copy of the $10,000 check from State Farm and said Bank of America had imposed some requirements before it would sign the check over to Schuchmacher. She agreed to provide a copy of Bank of America's demand letter to the Board the following day. The Board discussed the delinquent status of Schuchmacher's assessment and the pending bank foreclosure, then scheduled for September 26, 2011.

On September 19, 2011, Rockpointe filed a complaint against Schuchmacher to foreclose on a lien of $9,388 arising out of unpaid assessments in 2010 and 2011. The complaint did not include the $10,000 special assessment for the insurance deductible.

---

[2] There was conflicting testimony at trial about what became of the check. Latham testified that Bank of America cashed the check and applied the proceeds to Schuchmacher's delinquent mortgage account. Other testimony suggested that Schuchmacher may have cashed the check himself.

Brockhouse informed the Board on October 19, 2011, that she still had not received the documents Latham had agreed to provide on September 15, and that the foreclosure sale had been postponed to October 26, 2011.

Schuchmacher's mortgagee, Bank of America, foreclosed on the unit on October 26, 2011. The trustee's deed of sale was recorded on November 9, 2011.

## IV.    Latham contracts with Ruffino to do the repair work; subsequently, she moves back into the unit and begins to do the repair work herself.

Meanwhile, several months prior to the October 2011 foreclosure, Latham moved back into the unit and entered into a contract with Ruffino, a contractor recommended by a friend, to repair the unit.[3] Schuchmacher was not a party to that contract.[4] Indeed, Schuchmacher testified that he did not receive an estimate from Ruffino, did not hire Ruffino to repair the unit, and never received a request for payment from Ruffino. Ruffino

---

[3]    We will refer interchangeably to Ruffino and Ruffino Construction.

[4]    Schuchmacher's respondent's brief asserts that "Schuchmacher hired Ruffino to make repairs," but that statement is not supported by Schuchmacher's citation to Ruffino's testimony. That testimony is as follows: "Q: Now, did you enter into any kind of an agreement with Mr. Schuchmacher and Ms. Latham regarding the work that you were going to do at that unit?" "A [Ruffino]: *Ms. Latham, yes.* We came to an agreement that we'd work off the scope of work by Farmers Insurance." (Italics added.) Nor is it supported by the contract itself, which was signed only by Latham.

similarly testified that he contracted with Latham, not with Schuchmacher.  Ruffino did some demolition and framing work in the master bedroom in August 2011, but he stopped about three weeks later because he was not getting paid.

When Ruffino stopped working on the unit, Latham, who was not a contractor, began to do the repairs herself.  She worked primarily downstairs and in one upstairs bedroom.  She borrowed money to pay for supplies, paid friends to help her, and bartered with other friends for their help.

When she learned about the foreclosure, Latham stopped working on the unit, but she wanted to be paid for the work she had already done.  She testified that by that time, she had completed about 75 percent of the work described in Farmers' scope of work.  She told Bank of America that she would move out of the unit once she was paid for the work she had done.

## V. Latham continues to live in the unit, make repairs, and demand release of the insurance proceeds.

On about January 20, 2012, Latham faxed a letter to Brockhouse that demanded the release of $56,492 from the funds held in trust for the repair of the unit.  The letter stated:  "The repairs outlined in the attached bill from Ruffino Construction have been completed according to [Farmers' scope of work] and [in] compliance with current building codes and regulations.  Mike Ruffino is a licensed, bonded, insured general contractor and has complied with all requirements as stated in the CC&R's.  Therefore, I see no reason for further delay in issuing a check."  Latham admitted at trial that although the invoice appeared to have been issued by Ruffino for work he had done, she had prepared the invoice and billed for work she or her friends had done.

10

Brockhouse forwarded Latham's letter to Rockpointe's attorney, Jeffrey Beaumont, on about March 2, 2012, with an email that stated as follows: "Latham is requesting reimbursement to a contractor. The Association had no involvement in this contract whatsoever. There is no contract, either written or verbal, between Rockpointe and the contractor. Gershon Schuchmacher no longer owns the unit, it was foreclosed upon last year. Bank of America is trying to evict Kathleen Latham from the unit and, as you know, the Association has judicial action against Gershon Schuchmacher. [¶] Please let me know where Rockpointe stands on this and what action I need to take at this point."

In March 2012, Beaumont sent a letter to Latham that said as follows: "The Association is prepared to and will make the requested payments upon our receipt of the following: (1) An agreement—executed by you, Ruffino, _and_ Bank of America (the owner of the property)—releasing the Association from any and all liability with respect to the repair work to be undertaken; and (2) Written confirmation from Ruffino that the repair work has been completed and payment releases for [the] Association from any claims received." Beaumont testified that these releases were necessary to protect Rockpointe from suit because the Board was not clear on the legal relationships between Schuchmacher and Latham, and because Bank of America, "who's the owner of the unit, really has standing to step in and dictate what takes place with that unit." Rockpointe never received a release executed by Latham, Ruffino, and Bank of America.

On April 23, 2012, Beaumont further advised Latham that before any money could be released, Rockpointe needed an agreement "signed by the owner of the unit, lender and

11

contractor, stating how the money will be distributed. This must be provided to me prior to my client releasing any monies to anyone." According to Beaumont, neither he nor Rockpointe ever received a signed agreement.

On May 8, 2012, Bank of America sold the unit to Polymathic Properties.

On about June 14, 2012, Latham faxed Beaumont a letter seeking issuance of a check in the amount of $76,432 made payable to Ruffino. The letter attached a release of liability signed by Latham for Ruffino, but did not attach a release from the owner or a statement by Ruffino that all of the work identified by Farmers had been completed.

On about June 25, 2012, Beaumont's law partner, Lisa Tashjian, responded that the amount sought exceeded what Rockpointe had agreed to release, and Rockpointe still had not received all the documents required by Beaumont's March 15 letter. Tashjian said: "Unless and until a release for the amount authorized by the Board ($56,492.02) is signed and provided to the Association, the funds cannot and will not be released to you. [¶] In addition, you have failed to provide our office with written confirmation from Ruffino that the repair work has been completed and payment of the $56,492.02 will release the Association. Please provide this written confirmation to our office immediately. Once the proper documentation has been received and reviewed by our office, payment will be released."

Sometime in July, Latham provided Beaumont with two documents purportedly signed by Ruffino: a statement that "all work was performed and completed as per the description on the attached pages of Farmers Insurance 'Scope of work,' " and a release of liability stating that $56,492 "constitutes the entire

12

*unpaid* balance due the undersigned in connection with said project." Latham testified that she signed both of these documents with Ruffino's permission. On about July 26, 2012, Beaumont's firm acknowledged receipt of the release signed by Ruffino accepting $56,492 as full and final payment, but noted that it still had not received written confirmation that the repairs had been completed pursuant to the scope of work prepared by Farmers. The letter further said that Rockpointe believed the work had *not* been completed, and it requested access to the unit for an inspection.

According to Latham, this letter presented a problem for her because while she had completed much of the work described in Farmers' scope of work, she had done virtually no work in the master bedroom where the fire began. She understood the letter to mean that she would not be paid for any of her work unless she finished all of it. Therefore, she decided to finish the work in the master bedroom because she "couldn't sacrifice all that money."

Latham testified that between about August and November 2012, she completed the work described in Farmers' scope of work. On November 30, 2012, the Los Angeles Department of Building and Safety finalized the building permit.

On December 9, 2012, Latham sent a letter to Beaumont granting access to the unit for inspection and attaching a purported release from Ruffino Construction "for the full and completed contract for the repairs that match the estimate from Farmers ($86,024.02)." Attached to Latham's letter was a letter on Ruffino Construction letterhead that stated as follows: "Please accept this letter in confirmation that my contract (that is consistent with scope of work estimated by Farmers Insurance) has been completed for the property listed above. The

13

Department of Building and Safety has inspected and issued the 'Final' on the repair work.  It is my understanding that a) your firm, b) the Board and c) the HOA's contractor have been given the authority to inspect the unit any time from 12/10 to 12/21 and according to your letter of July 26, 2012, it appears that this inspection is the last requirement necessary for you to release a check to me.  [¶]  Therefore, I would appreciate your timely response in getting this inspection completed."  Latham admitted that she prepared and signed this letter, but testified that she did so with Ruffino's authority and approval.

Rockpointe did not respond to Latham's letters and did not conduct an inspection.  Latham sent the letters again in late March 2013, and in April 2013, Schuchmacher, Latham, and Ruffino were permitted to attend an executive board meeting.  Latham brought documents with her and said all the work had been completed and she and Ruffino would like to get paid.  The Board's president asked Latham for a copy of her lease, building permits, and a breakdown of the work that had been done.  He said the documents would be forwarded to Beaumont to review, "and if he said that we could cut a check, we would cut a check."  Latham agreed to bring the documents to Rockpointe's office the next morning, but she did not do so.

It is undisputed that Rockpointe never made any payments to Ruffino, Latham, or Schuchmacher for the work done in the unit.

## VI.   Latham is evicted from the unit; the unit is sold to a member of Rockpointe's Board, and the insurance proceeds are released to repair the unit.

Polymathic evicted Latham from the unit in May 2014 and shortly thereafter put the unit up for sale.  In August 2014, the

unit was purchased by Sturgeon, the president of Rockpointe's Board.

Sturgeon testified he made a visual inspection of the unit prior to purchasing it but did not hire a professional inspector. He did not see any evidence of fire damage, but said there was visible water damage to the hallway and family room ceilings and in the garage. He also noted significant disrepair, including windows and doors with broken windows and latches, a broken air conditioning unit, a broken garage door, visible wood rot in the kitchen, plumbing leaks, and a nonfunctional shower, bathtub, and toilet. He also observed what he characterized as "bizarre" remodeling to the unit, including the absence of closets in the bedrooms, the replacement of an eight-foot sliding glass door with a five-foot door, a sealed attic access, and several bathroom sinks not connected to plumbing.

After he purchased the unit, Sturgeon reported to Rockpointe management that there was water damage to the unit and was told that the HOA was holding insurance proceeds to repair the damage. In September 2014, he asked the Board to pay for identified issues in the unit. He planned to pay for other cosmetic repairs himself, including drywall repair, new carpet, new paint, and a kitchen remodel.

After Sturgeon began removing drywall, he discovered what he characterized as unremediated water damage from the fire, including dry rot and mold in the walls, the absence of insulation, charred wood hidden behind drywall, improperly capped plumbing that was dripping into the walls, and a nook filled with garbage and debris. Contractors hired and paid by Rockpointe repaired much of this damage. In all, Rockpointe

paid about $53,000 to repair the unit. Sturgeon spent an additional $30,000, for which he was not reimbursed.

## VII. The present action.

### A. Complaint and pretrial motions.

Schuchmacher, Latham, and Ruffino filed the present action on December 9, 2015. The operative complaint named 21 defendants, including Rockpointe, former directors David Winn, Andrea Canady, Tom McKenzie, and Dan Dockry (the former directors), general manager Brockhouse, current Rockpointe directors James McDermott, Lisa Pena, Helen Martin, and Wendi Gladstone (the current directors), and Board president Sturgeon. As relevant to this appeal, the complaint alleged as follows:

The first cause of action for breach of the CC&Rs, brought by Schuchmacher against Rockpointe, alleged that Rockpointe had a duty under the CC&Rs to repair the fire damage to Schuchmacher's unit, but it had refused to do so or to reimburse Schuchmacher for the cost of making the repairs.

The second cause of action for breach of fiduciary duty, brought by Schuchmacher against Brockhouse, the current and former directors, and Sturgeon, alleged that defendants breached their fiduciary duties by failing to assure that repairs were timely made to the unit, failing to reimburse plaintiffs for the costs of repairs, wrongfully assessing Schuchmacher $10,000, and permitting Sturgeon to misappropriate the insurance monies.

The third cause of action for civil conspiracy, brought by Schuchmacher, Latham, and Ruffino against Rockpointe, the current and former directors, and Sturgeon, alleged that defendants conspired to violate the CC&Rs, including by failing to pay for repairs to the unit.

16

The fourth cause of action for conversion, brought by Schuchmacher, Latham, and Ruffino against Sturgeon, alleged that Sturgeon abused his position as Rockpointe's president to misappropriate and convert to his own use a portion of the insurance proceeds.

Many of the defendants filed motions for summary judgment and/or summary adjudication. In August 2019, the trial court granted summary judgment for Brockhouse and the current directors, granted summary adjudication for Rockpointe on the civil conspiracy claim, and granted summary adjudication for the former directors on the civil conspiracy claim as to Latham and Ruffino only. Accordingly, the following claims remained at time of trial: (1) breach of the CC&Rs, by Schuchmacher against Rockpointe; (2) breach of fiduciary duty and civil conspiracy, by Schuchmacher against the former directors and Sturgeon; and (3) conversion, by Schuchmacher, Latham, and Ruffino against Sturgeon.

### B.    Trial and judgment.

The case was tried to a jury over twelve days in March and April 2019. At the conclusion of the plaintiffs' case, the trial court granted a nonsuit on the cause of action for conversion, thus eliminating Latham and Ruffino as plaintiffs.

In his closing argument, Schuchmacher's attorney told the jury that Rockpointe breached section 11.1 of the CC&Rs, which required it to rebuild improvements "promptly," and section 11.5, which required it to take all necessary steps to assure the commencement and completion of authorized repair " 'at the earliest possible date.' "  Counsel argued: "You are the ones to decide what promptly means. Does promptly mean two weeks? A month? Two months? I think we can all agree promptly does

17

not mean a year or two years." With regard to damages, counsel argued that "the amount of the damages is $87,221.67. That is the amount given by Farmers. . . . That is the sum that we submit is the amount of damages that should be paid and awarded to Mr. Schuchmacher in this case." Those damages accrued to Schuchmacher, counsel said, because "Mr. Schuchmacher had an obligation to Mr. Ruffino, Ms. Latham, to reimburse them for the work that they did, and he had the right to have that unit repaired, and it wasn't."

Rockpointe's counsel argued that Rockpointe never had an obligation to pay Ruffino because it did not receive the documentation it asked for. Further, even if Rockpointe broke a promise, "it's one for which there can no remedy because Gershon Schuchmacher was not the one promised to be paid. He's the one who has to suffer damages, and he's the only one you can reward with a verdict. You can't find damages for Latham and Ruffino and then transfer those somehow magically over to Gershon Schuchmacher. That's not how it works." Thus, counsel argued, damages "is another defense in this case. Damages aren't an optional part of a case. You don't get to prove up your case and then leave it in the hands of the jury to just come up with damages. You don't get to just put up Farmers['] scope of repair on the screen and point to it as your damages. That's not damages in this case. [¶] Gershon Schuchmacher was not out-of-pocket for any of the money on Farmers' scope of repair. He did not owe anybody for the repairs. He did not owe Michael Ruffino anything. He did not have a contract with Michael Ruffino. The only contract with Michael Ruffino . . . was [with] Kathleen Latham."

Counsel continued: "Plaintiff is suggesting . . . that, though the contract was between Latham and Ruffino, somehow Schuchmacher was obligated by it. . . . [¶] You heard the [deposition] testimony of Gershon Schuchmacher yesterday. And Gershon Schuchmacher said, 'I had no contract with Michael Ruffino.' He said, 'I was not out-of-pocket a penny in this case. I've not paid them.' If he's not out-of-pocket a penny in this case, he has no damages." Further, counsel said, "Latham and Ruffino allegedly did repairs here. You might ask yourself, well, if somebody has a claim for repairs, then they do. But they're not plaintiffs in this case anymore. You can only concern yourself with plaintiff Gershon Schuchmacher, and he has no damages."

In rebuttal, Schuchmacher's counsel argued: "What is this nonsense about no damages? If you own a home and it catches on fire, have you suffered damages? Mr. Schuchmacher suffered damages to his unit on April 16, 2011. The measure of damages . . . is based upon the scope of work and the estimate done by Farmers as to what is the cost of repairing those damages. It is that figure that we[] seek in damages in this case. The amount of those damages, the measure of damages is proven by Farmers['] scope of work." "Was Gershon Schuchmacher harmed? Yes, obviously. They didn't do the repairs. The repairs should have been completed before the time he lost the unit through foreclosure if they had acted diligently."

The jury returned a special verdict for Schuchmacher on the cause of action for breach of the CC&Rs and awarded damages of $76,432. The jury returned verdicts for the former directors and Sturgeon on the claims for breach of fiduciary duty and civil conspiracy. The trial court entered judgment on the special verdict on April 30, 2019.

19

## VIII. Posttrial motions.

### A. Rockpointe's motion for judgment notwithstanding the verdict.

Rockpointe moved for judgment notwithstanding the verdict. It urged that Schuchmacher had not established he suffered any damages as a result of the alleged breach of the CC&Rs because there was no evidence that he paid any out-of-pocket costs for the repairs, contracted with Latham or Ruffino to make repairs, or suffered any diminution in value of the unit. Accordingly, Rockpointe contended Schuchmacher was entitled to, at most, nominal damages of $1.

Schuchmacher opposed the motion. He contended that as the owner of the unit at the time of the fire, he was the party entitled to recover for injury to the unit, the cost of which was established by the scope of work and estimate prepared by Farmers. Further, Rockpointe was estopped from contending otherwise by having submitted a claim to Farmers and accepting checks in the amount of $76,432, the precise amount of the jury's verdict.

On June 28, 2019, the trial court denied the motion for judgment notwithstanding the verdict.

### B. Motions for attorney fees and to tax costs.

The parties filed a variety of motions relating to attorney fees and costs, including the following:

(1) Schuchmacher sought attorney fees of $913,005 plus a multiplier pursuant to Civil Code section 5975, which permits an award of attorney fees to the prevailing party in an action to enforce common interest development governing documents. Schuchmacher contended he had prevailed on his cause of action

against Rockpointe for breach of the CC&Rs, his attorney fees were reasonable in view of defendant's "egregious litigation tactics and refusal to settle," and his fees should not be apportioned among the various causes of action.

(2)     Rockpointe and the former directors sought attorney fees of $759,062. Rockpointe urged that it was entitled to costs, including attorney fees, because its pretrial settlement offer pursuant to Code of Civil Procedure section 998 exceeded Schuchmacher's recovery, and the former directors urged that they were entitled to fees pursuant to Civil Code section 5975 because they were the prevailing parties on Schuchmacher's claims against them to enforce common interest development governing documents.

The trial court found that Schuchmacher was entitled to recover attorney fees from Rockpointe because he prevailed on his sole claim against the HOA and his recovery exceeded Rockpointe's pretrial settlement offer. However, the court said the case had been severely overlitigated, and it reduced Schuchmacher's recoverable attorney fees to $67,500. The court denied the past directors' request for attorney fees, finding that although the past directors prevailed on Schuchmacher's claims for breach of fiduciary duty and civil conspiracy, those claims were not actions by an owner against other owners or against a homeowner's association within the meaning of Civil Code section 5975.

## C.    Judgment and appeal.

The court entered an amended judgment on August 26, 2019. It awarded Schuchmacher $76,432 on the first cause of action, plus costs of $17,065, prejudgment interest of $48,728, and attorney fees of $67,500. It entered judgment for defendants

21

on the remaining causes of action and awarded Rockpointe costs of $2,338, and the former directors costs of $43,567 and $10,887.

Rockpointe, the former directors, and Schuchmacher timely appealed from the judgment and postjudgment orders.

## DISCUSSION

On appeal, Rockpointe contends that there is no substantial evidence that Schuchmacher suffered actual damages, and that it, not Schuchmacher, should have been awarded prevailing party attorney fees. Separately, the former directors contend they are entitled to prevailing party attorney fees pursuant to Civil Code section 5975, subdivision (c).

Schuchmacher responds that there was ample evidence that he suffered damages, the trial court properly found that Schuchmacher's recovery exceeded Rockpointe's Code of Civil Procedure section 998 offer, and the former directors are not entitled to attorney fees. In his cross-appeal, Schuchmacher urges that the trial court abused its discretion by awarding him less than 8 percent of the attorney fees he sought.

As we discuss, Schuchmacher did not establish by substantial evidence that he suffered more than nominal damages, and thus we will reverse his damages award to $1. Having done so, we will return the matter to the trial court to redetermine attorney fees and costs in light of Schuchmacher's reduced recovery. Finally, we conclude that the former directors are not entitled to attorney fees under the doctrine of law of the case.

**I.    The jury's damages award was not supported by substantial evidence; Schuchmacher therefore is entitled to an award of only nominal damages.**

Rockpointe contends that the judgment must be reversed because there was no substantial evidence that its asserted breach of the CC&Rs caused Schuchmacher damages of $76,432. Specifically, Rockpointe asserts it was undisputed that the CC&Rs did not require it to turn over the insurance proceeds to Schuchmacher, Schuchmacher did not incur any out-of-pocket costs to repair the unit, Schuchmacher did not contract with Ruffino to repair the unit, and there was no evidence the unit suffered a diminution in value as a result of the unrepaired fire damage. Thus, Rockpointe urges, Schuchmacher is entitled to recover, at most, nominal damages of $1 for its breach of the CC&Rs.

Schuchmacher responds that it is indisputable that his unit was damaged by the fire and that the cost to repair the damage was $76,432—precisely what the jury awarded him. Further, he urges, Rockpointe is barred from claiming he did not suffer damages because it represented it would pay to repair the damages, and Schuchmacher relied on those promises when he made the repairs.

### A.    Legal principles.

"The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance.  (Civ. Code, § 3300.)  The aim is to put the injured party in as good a position as he or she would have been had performance been rendered as promised.  [Citation.]"

(*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 848 (*Kashmiri*).)  Thus, "[i]n an action for breach of contract, the measure of damages is 'the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom' (Civ. Code, § 3300), provided the damages are 'clearly ascertainable in both their nature and origin' (Civ. Code, § 3301)."  (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 550 (*Erlich*).)

Where a contract obligates a defendant to repair real property, damages for nonperformance generally are measured by the lesser of either the cost of repair, including lost use or relocation expenses, or the diminution in value of the property. (See, e.g., *Erlich, supra*, 21 Cal.4th at p. 561; *Orndorff v. Christiana Community Builders* (1990) 217 Cal.App.3d 683, 687– 688; *Coughlin v. Blair* (1953) 41 Cal.2d 587, 600 (*Coughlin*).) However, a property owner cannot recover "a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides."  (Civ. Code, § 3358; see also *Kashmiri, supra*, 156 Cal.App.4th at p. 848; *Wickman v. Opper* (1961) 188 Cal.App.2d 129, 133.)

Our review of a damages award is guided by several standards of review.  We review for substantial evidence whether a plaintiff was, in fact, damaged by a defendant's breach of contract.  (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc*. (2015) 243 Cal.App.4th 571, 583; *GHK Associates v. Mayer Group, Inc*. (1990) 224 Cal.App.3d 856, 873.)  Whether a certain measure of damages is permissible given the legal right the defendant has breached, is a matter of law, subject to de novo review.  (*New West Charter Middle School*

24

*v. Los Angeles Unified School Dist*. (2010) 187 Cal.App.4th 831, 843; *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691.) Finally, we review a factfinder's determination of the amount of compensatory damages for substantial evidence. (*LA Investments, LLC v. Spix* (2022) 75 Cal.App.5th 1044, 1062; *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614.) Under that standard, we "consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence." (*Rufo v. Simpson*, at p. 614.) " 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)" (*Anderson v. Ford Motor Co.* (2022) 74 Cal.App.5th 946, 961.)

### B. The evidence does not support the jury's award of compensatory damages.

It was undisputed at trial that the cost to repair the damage caused by the fire was $86,431, which Schuchmacher contended was the proper measure of his compensatory damages. Based on the general principles articulated above, had Schuchmacher not suffered foreclosure of the unit shortly after the fire, we would have no difficulty concluding that the jury's award of $76,432—the cost of repair, less the $10,000 insurance deductible—was based on a legally permissible measure of damages and was supported by substantial evidence.

The foreclosure significantly altered the damages calculus, however. Among other things, the foreclosure terminated Schuchmacher's membership in the HOA and ended the contractual relationship between Schuchmacher and Rockpointe.

25

(Civ. Code, § 4625 (formerly Civ. Code, § 1358) ["Any conveyance, judicial sale, or other voluntary or involuntary transfer of the owner's entire estate also includes the owner's membership interest in the association"].)  Whatever Rockpointe did or failed to do after Schuchmacher lost the unit to foreclosure, therefore, could not have constituted a breach of the CC&Rs as to Schuchmacher.  (See, e.g., *Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1032 [only property owners have standing to assert redress for violations of planned development governing documents, including CC&Rs].)  The relevant question for us in light of the foreclosure, therefore, is whether Schuchmacher established by substantial evidence that he suffered damages of $76,432 arising out of Rockpointe's actions *prior to* the October 2011 foreclosure.

In addition to limiting the time period during which Rockpointe had a duty to Schuchmacher under the CC&Rs, the foreclosure also had an effect on the nature of Schuchmacher's damages.  Had Schuchmacher not lost the unit to foreclosure, the cost of repairs would have been an accurate measure of his damages because he would have fully internalized the losses arising out of the fire.  That is, but for the foreclosure, Rockpointe's failure to repair the unit would have left Schuchmacher with two choices:  Either pay for the repairs out of his own pocket or suffer diminished use and enjoyment of the unit.  But because of the foreclosure, Schuchmacher would not have enjoyed the use of the property after October 2011 even had it been fully repaired by that time.[5]  Nor would the cost of any

---

[5]     We note in this regard that there was no evidence at trial as to when the unit would have been fully repaired had

26

uncompleted repairs have fallen on Schuchmacher; instead, postforeclosure, any additional repairs would necessarily have been the responsibility of a subsequent owner.

What, then, was the proper measure of Schuchmacher's damages? Under well-established authority, Schuchmacher would have been entitled to any diminution in value he suffered at the foreclosure sale as a result of the unrepaired fire damage (see, e.g., *Erlich*, *supra*, 21 Cal.4th at p. 561; *Coughlin*, *supra*, 41 Cal.2d at pp. 600–601), but he did not introduce any evidence at trial concerning the value of the property, the sale price, or the amount of his indebtedness. He also would have been entitled to recover for his lost use of the unit (*Erlich*, at p. 561)—but, again, there was no evidence about when Schuchmacher would have been able reoccupy the unit had it been promptly repaired, or of the reasonable value of Schuchmacher's use and enjoyment of the unit during the months that he should have been able to, but could not, occupy it. Neither diminution in value nor lost use, therefore, supports the jury's damages award.

Alternatively, had Schuchmacher paid to repair the unit or obligated himself contractually to do so prior to losing the unit to foreclosure, his out-of-pocket costs would have been a proper measure of his damages—but the evidence was undisputed that Schuchmacher did *not* pay to repair the unit and did not enter

---

Rockpointe "promptly" initiated repairs. As we have said, the fire occurred in April 2011, and Bank of America foreclosed on the unit approximately six months later, in October 2011. In the absence of evidence that the unit would have been fully repaired prior to October 2011 but for Rockpointe's breach of the CC&Rs, we do not believe that the evidence supported a damages award in any amount for lost use of the unit.

into a contract to do so. To the contrary, Schuchmacher testified that he did not "put money [up] front" for the repair of the unit, did not sign a contract with Ruffino to repair the unit, did not discuss payment arrangements with Ruffino, and did not receive a request for payment from Ruffino. Ruffino similarly testified that he "never entered into a contract with Gershon Schuchmacher" and, in fact, met Schuchmacher only once. And, although Schuchmacher testified that he orally agreed to allow Latham to repair the unit, neither he nor Latham testified that Schuchmacher promised to pay Latham for her work.[6]

Finally, the insurance proceeds would have been a proper measure of Schuchmacher's damages if the CC&Rs had obligated Rockpointe to turn over the insurance proceeds to him, but there was no evidence they did so. No one testified that Schuchmacher had a right to the insurance proceeds paid by Farmers, and no provision of the CC&Rs so provided. And, indeed, Schuchmacher's theory at trial was not that he had a direct right to the insurance proceeds, but rather that he had the right under the CC&Rs to have his unit promptly repaired.

---

[6]     Schuchmacher's counsel suggested at oral argument that Latham testified at trial that Schuchmacher had agreed to pay Ruffino. Not so. Latham's testimony was that she told Schuchmacher that he would be responsible to pay Ruffino—*not* that Schuchmacher ever agreed to do so. Latham also did not testify that Schuchmacher had authorized her to bind him to a contract with Ruffino. While Latham said she had Schuchmacher's authority to deal with the HOA and to repair the unit, neither she nor anyone else testified that Schuchmacher had authorized her to enter into a contract on Schuchmacher's behalf.

Although not directly on point, we find instructive several cases addressing claims against insurers for damages to property that occurred shortly before foreclosure. *Track Mortgage Group, Inc. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857 (*Track*) is one such case. There, a property owner reported severe damage to an apartment building to its insurer, which did not pay the claim. About two months later, the lender holding the first deed of trust foreclosed on the building. The indebtedness under the first deed of trust at the time of foreclosure was approximately $528,000, and the lender purchased the property at the foreclosure sale with a partial credit bid of about $472,000. (*Id.* at pp. 862–863.) The lender spent about $1.2 million repairing the building and then sued the insurer for breach of contract and breach of the covenant of good faith and fair dealing. (*Id.* at p. 863.) The trial court found the insurer breached the insurance contract and that the lender had spent about $877,000 to repair damages covered by the policy. The court ruled, however, that the amount the lender could recover was limited to the difference between the $528,000 obligation secured by the trust deed at the time of foreclosure and the lender's $472,000 credit bid. (*Id.* at p. 864.)

The lender appealed, contending that it should have been awarded the costs of repair notwithstanding the partial credit bid. (*Track*, *supra*, 98 Cal.App.4th at p. 864.) The Court of Appeal disagreed and affirmed. It explained that when a lender makes a full credit bid at the foreclosure of its mortgage, it is not entitled to insurance proceeds payable for prepurchase damage to the property because the lender's only interest in the property is the repayment of the debt. (*Ibid*.) Thus, the trial court properly calculated the lender's damages as the difference between its

indebtedness and the amount of its partial credit bid. (*Id.* at p. 866.)

Track is distinguishable from the present case, most significantly in that the *Track* plaintiff had a direct claim to the insurance proceeds by virtue of the property insurance contract, while here Schuchmacher has no such claim. *Track* nonetheless stands for the proposition that where property damage occurs shortly before foreclosure, both the original owner and the foreclosing lender may have claims to the insurance proceeds payable as a result of the property damage, and the division of those proceeds depends on a variety of factors, including the amount of the original owner's indebtedness and the price paid for the property at the foreclosure sale.[7] Because that evidence was not presented to the jury, we cannot conclude that the jury's award of the entirety of the insurance proceeds to Schuchmacher was supported by substantial evidence.

The thrust of Schuchmacher's argument on appeal is that the amount of his damages was established by evidence of the damage to the unit, but his respondent's brief does not cite a single case or statutory provision for this contention. Below, in opposition to Rockpointe's motion for judgment notwithstanding the verdict, he relied exclusively on *Vaughn v. Dame*

---

[7] See also *Najah v. Scottdale Ins. Co.* (2014) 230 Cal.App.4th 125 [where lender acquired property through a full credit bid at foreclosure sale, it was not entitled to insurance proceeds due on claim arising out of preforeclosure damages to the property]; *Countrywide Home Loans, Inc. v. Tutungi* (1998) 66 Cal.App.4th 727 [where HOA received insurance proceeds after earthquake, lender who foreclosed on the property, not the owner at the time of the earthquake, was entitled to the unit's share].

30

*Construction Co.* (1990) 223 Cal.App.3d 144 to assert that because he owned the unit at the time of the fire, he is entitled to recover damages resulting from the fire. *Vaughn* concerned a different issue, however—namely, whether a plaintiff had standing to sue for property damage notwithstanding her subsequent sale of the property. *Vaughn* expressly did *not* decide the proper measure of the plaintiff's damages; instead, because the appeal was from a grant of summary judgment for the defendant, the court merely found that it was undisputed that plaintiff had suffered some harm. (*Id.* at p. 146, fn. 2.) Thus, while *Vaughn* suggests that Schuchmacher has standing to sue for the damages he suffered as a result of Rockpointe's breach of contract—an issue that is not before us—it does not suggest that Schuchmacher's damages were equal to the damages to the unit.

Schuchmacher further urges that Rockpointe is equitably estopped from denying that he suffered damages because it repeatedly offered in writing to reimburse him for the costs of repairs. Not so. While it is undisputed that Rockpointe's attorneys made the offers on which Schuchmacher relies, those were offers to pay *Ruffino*, a licensed contractor, for work he assertedly had done pursuant to a contract with Schuchmacher—*not* offers to pay Schuchmacher for work done primarily by *Latham*, for which Schuchmacher was not contractually obligated. Moreover, at the time of those offers, Latham had represented to the Board that Schuchmacher had entered into a contract with Ruffino to repair the unit, a representation it subsequently learned not to be true. Accordingly, we cannot conclude that the Board's offers to pay Ruffino for his work equitably estop Rockpointe from asserting on appeal that

31

Schuchmacher did not suffer damages as a result of Rockpointe's breach of the CC&Rs.

### C. Schuchmacher is entitled to an award of nominal damages.

Nominal damages pursuant to Civil Code section 3360 "are properly awarded in two circumstances:  (1) Where there is no loss or injury to be compensated but where the law still recognizes a technical invasion of a plaintiff's rights or a breach of a defendant's duty; and (2) although there have been real, actual injury and damages suffered by a plaintiff, the extent of plaintiff's injury and damages cannot be determined from the evidence presented.  (Civ. Code, § 3360; *Sterling Drug, Inc. v. Benatar* (1950) 99 Cal.App.2d 393, 400; *Gray v. Craig* (1932) 127 Cal.App. 374, 378; Black's Law Dictionary (4th ed. 1951) at p. 469.)  [¶]  Whichever classification the nominal damages fall into, they remain [n]ominal; the court can award no more than nominal damages when the proof of actual or punitive damages fails." (*Avina v. Spurlock* (1972) 28 Cal.App.3d 1086, 1088 (*Avina*).)

California courts have applied Civil Code section 3360 to conclude that " '[a] plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him.' (*Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632.)  Nominal damages may be properly awarded for the violation of a contractual right because 'failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages.' " (*Elation Systems, Inc. v. Fenn Bridge LLC* (2021) 71 Cal.App.5th 958, 965–966 (*Elation Systems*).)

In the present case, the jury found that Rockpointe breached a duty it owed to Schuchmacher under the CC&Rs, and Rockpointe has not challenged that finding on appeal. Accordingly, we direct the trial court on remand to strike the award of compensatory damages and replace it with an award of $1 as nominal damages. (See *Elation Systems*, *supra*, 71 Cal.App.5th at pp. 967–968 [where substantial evidence did not support jury's award of $10,000 in damages for breach of nondisclosure agreement, trial court should have stricken $10,000 award and replaced it with award of nominal damages in light of jury's unchallenged finding of breach]; *Avina*, *supra*, 28 Cal.App.3d at p. 1090 [modifying judgment by striking award of $501 and substituting $1 as nominal damages].) Given our conclusion, the award of prejudgment interest on the damages award must also be stricken.[8]

## II. In light of our reduction of Schuchmacher's damages award, the matter must be returned to the trial court to reconsider Rockpointe's and Schuchmacher's competing motions for attorney fees and costs.

Rockpointe contends in its appeal that it was entitled to an award of its attorney fees and costs because its Code of Civil Procedure section 998 offer exceeded Schuchmacher's recovery, and Schuchmacher contends in his cross-appeal that the trial court abused its discretion by awarding him attorney fees of only $67,500. In light of our conclusion that Schuchmacher is entitled to only nominal damages, we vacate the award of attorney fees

---

[8] Because we reverse the judgment, the order denying the motion for judgment notwithstanding the verdict is moot.

for Schuchmacher and direct the trial court on remand to reconsider the parties' requests for attorney fees and costs in light of the reduced damages award.

## III. The trial court properly denied the former directors' motion for attorney fees.

Finally, the former directors contend that they are entitled to recover their attorney fees pursuant to Civil Code section 5975, subdivision (c), because "the gist" of Schuchmacher's claims against them, although "labeled as" breach of fiduciary duty and conspiracy, was for enforcement of the CC&Rs. We rejected a nearly identical claim in an earlier appeal brought by Brockhouse and the current directors, and we do so again here.

### A. Notice of appeal.

We begin by considering whether the former directors properly appealed from the order denying their motion for attorney fees. Rockpointe filed two notices of appeal, on July 29 and September 10, 2019, neither of which designated the former directors as appellants. We therefore asked the parties to submit letter briefs addressing whether Rockpointe's notices of appeal should be construed to include the former directors. In their supplemental letter brief, the former directors urged that notices of appeal may be construed to include omitted parties, and it is appropriate to do so here because Schuchmacher had not been misled or prejudiced; to the contrary, both parties understood the appeal to embrace the former directors' claim. In his supplemental brief, Schuchmacher said he "has no objection to the Court construing Rockpointe's Notice of Appeal to include its four former directors and would prefer to have the directors' appeal heard on its merits."

"[T]he timely filing of an appropriate notice of appeal or its legal equivalent is an absolute prerequisite to the exercise of appellate jurisdiction." (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 670.) However, "[t]he notice of appeal must be liberally construed. The notice is sufficient if it identifies the particular judgment or order being appealed." (Cal. Rules of Court, rule 8.100(a)(2).) This rule of liberal construction "is intended to 'implement the strong public policy favoring the hearing of appeals on the merits.' (*Norco Delivery Service, Inc. v. Owens-Corning Fiberglas, Inc.* (1998) 64 Cal.App.4th 955, 960; see *Glassco v. El Sereno Country Club, Inc.* (1932) 217 Cal. 90, 92 ['notices of appeal are to be liberally construed with a view to hearing causes on their merits']; *Kellett v. Marvel* (1936) 6 Cal.2d 464, 471 ['notices of appeal are liberally construed to preserve the right of review unless it appears that the respondent has been misled'].)" (*K.J. v. Los Angeles Unified School Dist.* (2020) 8 Cal.5th 875, 882.)

In *K.J. v. Los Angeles Unified School Dist.*, *supra*, 8 Cal.5th at page 865, our Supreme Court noted that while the rule of liberal construction of notices of appeal is most commonly employed to remedy defects in a notice's designation of the order or judgment that is being appealed from, the rule also applies to defects in the notice's designation of the parties to the appeal. The court therefore held that a court "is not categorically precluded" from construing a notice of appeal to include a party who is not referenced in the notice, so long as it is "reasonably clear that the [omitted party] intended to join in the appeal, and the respondent was not misled or prejudiced by the omission." (*Id.* at p. 885.)

Applying this standard here, we conclude that Rockpointe's notices of appeal should be construed to include the omitted former directors. The September 17, 2019 notice of appeal stated that appeal was taken from an August 9, 2019 postjudgment order that, among other things, denied the former directors' motion for attorney fees. Further, Rockpointe's case information statement filed September 26, 2019, identified the former directors as appellants, as did the parties' stipulation for consolidation of appeals and proposed briefing schedule. Finally, Schuchmacher's response to our request for briefing makes clear that he was neither misled nor prejudiced by the omission. Accordingly, we will construe Rockpointe's notices of appeal to include the former directors.

### B. Our prior decision in *Schuchmacher I*.

*Schuchmacher v. McDermott* (Mar. 28, 2019, B288130) [nonpub. opn.] [2019 WL 1396737] (*Schuchmacher I*) was an appeal by Brockhouse and the current directors from postjudgment orders denying their motions for attorney fees after they obtained summary judgment of Schuchmacher's causes of action against them for breach of fiduciary duty and civil conspiracy. Brockhouse and the current directors contended that attorney fees were proper pursuant to Civil Code section 5975, subdivision (c) because the causes of action were grounded in enforcement of the CC&Rs. (*Schuchmacher I*, at p. *2.) The trial court denied the motion for fees, finding that the moving parties were not entitled to recover fees under Civil Code section 5975. (*Schuchmacher I*, at p. *3.)

We affirmed. We explained that Civil Code section 5975, which is part of the Davis-Stirling Common Interest Development Act (Civ. Code, § 4000 et seq.), states in full:

36

"(a) The covenants and restrictions in the declaration[9] shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development.  Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both.  [¶]  (b) A governing document other than the declaration may be enforced by the association against an owner of a separate interest or by an owner of a separate interest against the association.  [¶]  (c) *In an action to enforce the governing documents,*[10] *the prevailing party shall be awarded reasonable attorney's fees and costs.*"  (Italics added.)

Thus, we said, "unless 'the Declaration provides otherwise, each owner of a lot or unit in a tract subject to restrictions has the right as an individual to enforce the restrictions against any and all of the other owners' separate interests in the development, or against the association to compel the association to take appropriate enforcement action.'  (Miller & Starr, Cal. Real Estate (4th ed.) § 28109, fn. omitted, italics omitted.)

---

**9**    Civil Code section 4135 states: " 'Declaration' means the document, however denominated, that contains the information required by Sections 4250 and 4255."  The contents of the declaration shall include, inter alia, "the restrictions on the use or enjoyment of any portion of the common interest development that are intended to be enforceable equitable servitudes." (Civ. Code, § 4250, subd. (a).)

**10**    "Governing documents" means the "declaration and any other documents, such as bylaws, operating rules, articles of incorporation, or articles of association, which govern the operation of the common interest development or association." (Civ. Code, § 4150.)

Under ' "well-accepted principles of condominium law, a homeowner can sue the association for damages and an injunction to compel the association to enforce the provisions of the declaration." ' (*Lambden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 268.)" (*Schuchmacher I, supra,* 2019 WL 1396737, at p. *5.)

We concluded that the causes of action against Brockhouse and the current directors were not suits to enforce the CC&Rs, and thus the moving parties were not entitled to attorney fees pursuant to Civil Code section 5975. We explained: "In the second cause of action, Schuchmacher sued Brockhouse, the former general manager of the HOA, alleging breach of fiduciary duty and seeking tort damages. In the third cause of action, Schuchmacher, together with Latham, his tenant, and Ruffino, a contractor, sued the Current Directors and others for civil conspiracy, and likewise sought tort damages. Neither of these causes of action was an action by an owner against other owners, or against the HOA, *to enforce the governing documents*, making Civil Code section 5975(c) inapplicable.

"The cases cited by appellants for the proposition that Civil Code section 5975(c) was implicated are inapposite. Each of those decisions involves litigation between an owner, former owner, or alleged assignee of an owner, on the one hand, and a homeowners association on the other, to enforce the relevant governing documents. . . .

"In the instant case, the relevant causes of action are tort claims by an owner and two non-owners, who sued a former manager of the HOA and its Current Directors for damages. As the trial court found, this was not an action to enforce the governing documents. Therefore, Brockhouse and the Current

Directors are not entitled to attorney fees pursuant to Civil Code section 5975(c)." (*Schuchmacher I, supra*, 2019 WL 1396737, at p. *6.)

### C. Our conclusion in *Schuchmacher I* is law of the case, and thus we will not reconsider it on the merits.

The doctrine of "law of the case" generally precludes repeated appellate review of the same issue in a single case. " ' " 'Where a decision upon appeal has been rendered . . . and a second appeal comes to this court . . . , for reasons of policy and convenience, this court generally will not inquire into the merits of said first decision, but will regard it as the law of the case.' [Citations.]" ' (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 668.)" (*People v. Gray* (2005) 37 Cal.4th 168, 196–197.)

" 'The principal reason for the doctrine is judicial economy. "Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding." ' [Citations.] . . . [¶] We will apply the law of the case doctrine where the point of law involved was necessary to the prior decision and was ' "actually presented and determined by the court." ' [Citation.] The doctrine will not be applied, however, when such application leads to an unjust result. Because the law of the case doctrine 'is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a "manifest misapplication of existing principles resulting in substantial injustice" [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first

and second appellate determinations. [Citation.] The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination.' " (*People v. Gray*, *supra*, 37 Cal.4th at pp. 196–197.)

The former directors do not dispute that the applicability of Civil Code section 5975, subdivision (c) to Schuchmacher's breach of fiduciary duty and civil conspiracy claims was presented to, and decided by, this court in *Schuchmacher I*, or that resolution of the issue was necessary to our decision. They urge, however, that the principle of law we articulated in *Schuchmacher I* does not apply here because while current directors "were not on the Association's Board of Directors at the time of Schuchmacher's ownership of the unit," the former directors "had a purported duty to enforce the CC&Rs at the time of the fire."

We do not agree that *Schuchmacher I* does not apply here. Although Schuchmacher's claims against the current directors were manifestly on weaker legal ground than were the claims against the former directors—and were, thus, subject to summary judgment—both sets of claims were based on the same legal theory: That the directors "owed a fiduciary duty to each owner of a condominium unit within the Rockpointe development to see that the affairs of [the HOA] were conducted in accordance with the Association's governing documents." Accordingly, we conclude the law of the case doctrine applies and compels the conclusion that the former directors are not entitled to recover prevailing party attorney fees pursuant to Civil Code section 5975, subdivision (c).

# DISPOSITION

The judgment and order granting attorney fees are reversed and the matter remanded to the trial court. On remand, as to the first cause of action, the trial court shall enter judgment for Schuchmacher, reduce the award of compensatory damages from $76,432.64 to $1, and eliminate the award of prejudgment interest. As to the second and third causes of action, the court shall enter judgment in favor of defendants. The trial court shall conduct further proceedings consistent with this opinion, including (1) reconsidering Schuchmacher's and Rockpointe's requests for attorney fees and costs, and (2) entering an amended judgment.

The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

41